UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------- X

LARRY MCKEE,

                                        Plaintiff,

                    - against -

THE CITY OF NEW YORK; New York City Police
Department Detectives MICHAEL GAUGHAN and JAMES
TIERNEY;  Bronx County District Attorney's Office
Assistant District Attorney WILLIAM RACOLIN, THE
BRONX DISTRICT ATTORNEY's OFFICE, and "JOHN
and/or JANE DOES" # 1-10 who are currently unknown
members of the New York City Police Department; and
"RICHARD and/or RACHEL ROES # 1-10" who are
currently unknown members of the Bronx County District
Attorney's Office, all of whom are being sued in their
individual capacities,

                                        Defendants.
------------------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff LARRY MCKEE, by and through his attorneys, the undersigned, states as follows:

**PRELIMINARY STATEMENT**

1.       This is a civil rights action against the City of New York based on and arising out

of wrongful acts and omissions of the New York City Police Department, the Bronx County

District Attorney's Office and certain of the employees and agents of these offices, and against

named individual employees and agents of these offices, in which the Plaintiff, LARRY MCKEE

seeks relief for the violation of his rights secured by the Fourth, Fifth, Sixth, and Fourteenth

Amendment to the United States Constitution, and of his rights secured under the laws and

Constitution of the United States, as well as the laws and Constitution of the State of New York..

2.       Mr. McKee seeks damages, both compensatory and punitive, an award of costs

and attorney's fees, and such other and further relief as this court deems just and proper, for

having spent over two decades in prison for crimes he did not commit.  Although he consistently maintained his innocence at trial and throughout his numerous years in prison, Mr. McKee was branded as a murderer and held as a State prisoner.

## STATEMENT OF FACTS

3.      Plaintiff LARRY MCKEE was convicted of Murder in the Second Degree on October 29, 1997, following trial, under Bronx Supreme Court Indictment Number: 1638/1996. He was sentenced to 25 years to Life by Judge Phyllis Skloot Bamberger of Bronx County Supreme Court.  He had been incarcerated in City of New York jails since his arrest on this matter on February 20, 1996, through November 20, 1997, for a total of 639 days.

4.      Assigned DIN Number 97A7092, Larry McKee was then falsely imprisoned in New York State prisons from November 20,1997, through January 29, 2018, for a total of 7,375 days – a period of more than twenty (20) years. Mr. McKee was confined during that time to State prison facilities including but not limited to: Adirondack Prison, Attica, Groveland, and Five Points.

5.      Mr. McKee's tragic case began on February19, 1996, at approximately 8:30 pm, at the corner of 176th Street and University Avenue, Bronx, New York, when Theodore Vance was involved in a physical altercation with Mr. McKee.

6.      According to eye witness reports, the altercation began when the victim approached and began to strike Mr. McKee with an extending metal baton. Vance and Mr. McKee had engaged in a physical altercation for several minutes, which was broken off by Mr. McKee.  Then, suddenly, according to witnesses, as Mr. McKee was removing himself form the altercation with Vance running behind him, a Hispanic male emerged and shot Vance twice.

7.      Vance died shortly thereafter. The People however, did not try the claimant based on those facts.

8.      At trial, the government tried the case under the theory that claimant acted alone, having fought with the victim, then came back to the scene with a gun and shot the victim at point blank range.

9.      Grand Jury testimony that was not discovered until December 2017, established that Vance made a dying declaration to a witness and said "I saw a Spanish guy" with respect to who shot him.  This Grand Jury testimony should have been disclosed as exculpatory Brady material prior to the claimant's 1997 murder trial but instead was withheld.

10.     Witnesses both during trial and during post-trial proceedings, also stated that Mr. McKee was not the shooter, but rather it was a Spanish man with a "high yellow" complexion.

11.     Despite that evidence, the Plaintiff was falsely arrested on February 20, 1996, by the New York City Police Department, 46th Precinct. A line up was conducted with the prosecution witness, 16 year-old Rossy Chatlain who identified Mr. McKee as the shooter.

12.     Claimant was convicted behind the eyewitness testimony of Rossy Chatlain, an interested witness (close friend to decedent Vance and who considered the victim to be family).

13.     Chatlain claimed at trial that he heard the shots and saw gun flashes, but never saw Mr. McKee with a gun in his hand.

14.     Members of the NYPD and Bronx District Attorney's Office should have discounted Chatlain as a witness as his version of the events did not comport with the physical evidence in the case or any other witnesses' version of the events.

15.     During trial, a 911 call was excluded from evidence, which identified the shooter as a Spanish male.

16.     Several police reports were not exchanged with the defense in a timely matter prior to trial, which indicated that yet another eyewitness had reported to police that the shooter may have been Spanish.

17.     Upon information and belief, members of the NYPD knew that Vance's last words were "I saw a Spanish guy", but failed to properly investigate and disclose the true ethnicity of the killer.

18.     On October 29, 1997, following trial, claimant was improperly convicted of second degree murder, and sentenced by the Hon. Phyllis Skloot-Bamberger to a sentence of 24 years to life.

19.     A post-trial evidentiary hearing was held due to the late discovery of a "Homicide Memorandum" that tended to show that Larry McKee was most likely not the shooter in the subject crime

20.     The "Homicide Memorandum" was improperly not disclosed until shortly before the time of trial.

21.     The withheld "Homicide Memorandum" indicated that there was an eyewitness named Augustus Rivera who said that he saw two Spanish men and an African American man running after the shots and that one of the Hispanic men was holding a pistol.

22.     There is significant documentary and other testimony which indicates that the NYPD acted with deliberate indifference, intent, malice, gross negligence, and recklessness to various sources of information/leads that established that the claimant was not the shooter involved in the murder of Theodore Vance.

23.     Claimant while in custody of the NYPD the day following the murder denied the crime but was told by an NYPD Detective that *"We know you didn't do this, but you are going to get convicted of it."*

24.     The City of New York Police Department and the Bronx District Attorney's Office, their agents, officers, and employees acted with deliberate indifference, intent, malice, gross negligence and recklessness in withholding critical evidence that would tend to exonerate Mr. McKee.

25.     Defendant Detective MICHAEL GAUGHAN was assigned to conduct a canvass of the area and surrounding buildings and obtained a statement from Augustus Rivera outlined in paragraph 13 of this complaint that established Mr. McKee was not of the same race or description as the shooter.  .

26.     Defendant Gaughan never reduced that statement to an official DD5 or other report and only made an oral report of the statement to the assigned on-duty Assistant District Attorney.

27.     Defendant Gaughan made no further efforts to give this information to any other member of the Bronx District attorney's Office.

28.     Defendant Detective JAMES TIERNEY was assigned to investigate the murder of Vance and was the lead detective in the case.  Like defendant Gaughan, he failed to disclose evidence that tended to establish the innocence of Mr. McKee.

29.     Defendant TIERNEY failed to conduct a proper and thorough investigation choosing to rely upon only the testimony of Rossy Chatlain and Chatlain's alleged identification of Mr. McKee.  Defendant Tierney did not present the full facts of his investigation to his supervisors and members of the Bronx District Attorney's Office.

30.     Defendant WILLIAM RACOLIN was possessed of information that tended to establish the innocence of Mr. McKee but intentionally withheld that information from the Grand Jury, the trial court, the trial jury, and defense counsel.

31.     It was not until late December 2017, that the Bronx District Attorney's Office disclosed this essential Brady Material- that the victim made a dying declaration to a Grand Jury witness.

32.     Indeed, at Grand Jury the undisclosed witness testified that the victim, while bleeding to death on the ground said he "saw a Spanish man" shoot him.

33.     The Bronx District Attorney's Office joined in Mr. McKee's motion to vacate the conviction and to dismiss the indictment with prejudice.

34.     The conviction was vacated and the indictment dismissed on January 29, 2018 by Order of the Honorable Judge Robert Torres, Bronx County (see Exhibit "A").

35.     After spending over twenty years in prison, Mr. McKee was finally released on January 29, 2018.

36.     The grounds for this action arise out the wrongful, unlawful, and improper acts of these defendants, including, without limitation, creation and perpetuation of false evidence and conspiracy to create and perpetuate false evidence; suppression and concealment of exculpatory evidence and conspiracy to suppress and conceal exculpatory evidence in violation of Mr. McKee's civil rights; false arrest; malicious prosecution; and intentional infliction of emotional distress.

37.     Plaintiff further seeks monetary damages against the City of New York pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) for the deliberate indifference of policymakers at the New York City Police Department and the Bronx

District Attorney's Office to other earlier examples of such constitutional violations as Mr. McKee faced herein. That indifference was a substantial cause of the harm inflicted upon Mr. McKee.

## JURISDICTION

38.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1988, and the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution and pursuant to Article 1 §§ 1, 6, and 12 of the Constitution of the State of New York.

39.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

40.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

41.     Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

42.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

43.     Plaintiff LARRY MCKEE is a citizen of the United States and was at all times relevant to this Complaint a resident of the State of New York.

44.     Defendant CITY OF NEW YORK ("City") is a municipal corporation created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department and does maintain the New York City Police Department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

45.     Defendant Detective MICHAEL GAUGHAN, Shield Number 1183, ("Det. Dietz") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

46.     Defendant Detective JAMES TIERNEY, Shield Number 4252, ("Det. Tierney") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.   He is being sued in his individual capacity.

47.     Defendant WILLIAM RACOLIN ("Racolin") was at all relevant times to this Complaint a duly appointed Assistant District Attorney of the Bronx District Attorney's Office, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and

the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

48.     The Bronx County District Attorney's Office ("BCDAO") was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Bronx County of the City of New York. It is an agency of Bronx County, a constituent county of the City of New York. The District Attorney; Assistant District Attorneys; and Bronx District Attorney's investigators are deemed employees of both the County of the Bronx and the City of New York.

49.     In addition to the named individual defendants and Roes #1-10, the BCDAO includes those individuals assigned to supervise and train the named individual defendants and Roes #1-10.

50.     Defendant Does # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those other officers, detectives, supervisors, and/or other agents, and employees of the NYPD, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein.

51.     Defendant Does # 1-10 are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual capacities.

52.     Defendant Roes # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "Richard Roe" and "Rachel Roe," represent those other attorneys, officers, detectives,

supervisors, and/or other agents, and employees of the Bronx District Attorney's Office acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein.  They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  They are sued in their individual capacities.

53.     The Bronx County District Attorney's Office ("BCDAO") was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Bronx County of the City of New York. It is an agency of Bronx County, a constituent county of the City of New York.  The District Attorney; Assistant District Attorneys; and Bronx District Attorney's investigators are deemed employees of both the County of the Bronx and the City of New York.

54.     The lack of evidence of Mr. McKee's guilt should have caused defendants to be concerned that they had wrongfully and/or, at least, incorrectly charged Mr. McKee and were wrongfully and incorrectly prosecuting him.

55.     This awareness should have caused them to reinvestigate and reconsider the charges and continuing the prosecution.

56.     Instead, the defendants disingenuously stuck to the script and scenario they created – that Mr. McKee was responsible for that crime.

57.     The defendants disingenuously stuck to this constructed scenario; withheld evidence that went against that scenario; ignored evidence that established that Chatlain was an unreliable informant; maliciously acted to derail Mr. McKee's attempts to gain his freedom;

obstructed the just and honest resolution to the murder of Theodore Vance and subjected Mr. McKee to over twenty years of wrongful imprisonment.

58.     Rather than question the integrity of their arrest and prosecution of Mr. McKee or admit its lack of integrity, the defendants, including those working in both the NYPD and the BCDAO, suppressed the truth about their unlawful actions, including, withholding of evidence, eliciting false testimony at trial, silencing honest and corroborated statements constituting exculpatory evidence and conducted a Constitutionally-inadequate investigation.

## LIABILITY OF THE INDIVIDUAL DEFENDANTS

59.     All the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers, investigators prosecutors, supervisors, and employees, acting within the scope of their employment.

60.     The individual defendants, in committing the aforesaid conspiracies, acts, and omissions to act, were acting with actual malice; deliberately indifferent to; and in reckless disregard of, plaintiff's rights and thereby caused actual injuries to the plaintiff.

61.     The defendants, in committing the aforesaid acts, were acting as joint tortfeasors, described above, the individual defendants subjected Mr. McKee to loss of liberty and other deprivations of constitutional rights, including, but not limited to, deprivation of the rights to due process of law and protection from pain and suffering, severe and permanent emotional injuries, mental anguish as well as other psychological injuries, extreme emotional distress, shame, humiliation, indignity, damage to reputation, loss of earnings, and obliged them to pay for legal fees and expenses.

## MUNICIPAL LIABILITY

**For the Actions of the Detectives Pursuant to the Policies and Practices
in Existence at the Time of the Investigation and Prosecution of McKee's Case**

62.     All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the New York City Police Department.

63.     Defendant City and the NYPD, by their policy-making agents, servants, and employees, authorized, sanctioned, and/or ratified the police defendants' wrongful acts; and/or failed to prevent to stop these acts; and/or allow or encouraged these acts to continue.

64.     The actions of police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegation without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to call witnesses in their defense by impermissible means such as concealment, intimidation, coercion, and other abuses of authority.

65.     The existence of such unlawful *de facto* polices and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the NYPD and the City of New York.

66.     Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officers and officials of the NYPD and the City of New York and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead

sanctioned and ratified these policies, customs, and practices through their deliberate

indifference to or reckless disregard of the effect of said, policies, customs, and practices upon

the constitutional rights of persons in the City of New York.

67.     The City of New York's policies and practices in existence at the time of the

conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia,* the

following:

> a.      The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

> b.      The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

> c.      The failure to properly supervise, train, instruct, and discipline police officers with regard to the adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

> d.      The failure to properly supervise, train, instruct, and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

> e.      The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, and to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions;

> f.      The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stories, *inter alia,* in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements designed to cover for and and/or falsely exonerate accused police officers;

> g.      Encouraging and/or failing to discipline officers for "testifying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt.

> h.      Having a policy whereby homicide memorandums are not placed in the case file and are instead just held aside by the Police Department and the District

Attorney's Office delaying or preventing the memorandums being exchanged to defense counsel;

68.     The City of New York's policies, practices, and customs in existence at the time of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evidenced, *inter alia,* by the following;

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), dated July 7, 1994, states:

> In the face of this problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse.  It has become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself.  As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out.  Such an institutional reluctance to uncover corruption is not surprising.  No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective.  A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers.  Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered.  This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training, and recruitment.
>
> For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

Mollen Commission Report, p. 2-3.

b.  Accordingly, in 1990, the Office of Special Prosecutor, which investigated charges of police corruption was abolished.

c.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system…

...Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them...

...What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful.  As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

69.     Since at least 1984, defendant City of New York and the New York City Police Department have been on notice that police officers joining the force, including, upon information and belief, individual defendant police officers herein, were disproportionately involved in misconduct and abuse.  *See, e.g.,* Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

70.     The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations.

71.     Prior to July 1993, the Civilian Complaint Review Board (CCRB), which is responsible for receiving and investigating complaints of police misconduct made by citizens

against members of the New York City Police Department, operated as an agency of the New York City Police Department rather than as an independent, unbiased entity.

72.     During the 1980s, the early 1990s, and in and about the time frame of the McKee investigation, the CCRB received numerous complaints of police misconduct, but failed fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases.

      a.   On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received.

      b.   The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

      c.   On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases.

      d.   Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

      e.   Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992.

      f.   The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

      g.   More than $82 million was paid in damages to victims of police misconduct in 1352 cases between 1992 and 1995.

73.     In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, defendant City imposes no discipline, either before or after

resolution in court, almost never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

74.     Former New York City Police Commission Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho more and prejudices, its cover-ups and silence, is reinforced every day in every way."

75.     Upon information and belief, police officers receive no training regarding how to conduct interrogations in a manner that will prevent false statements, and, in fact, are indoctrinated in the use of false promises, threats and intimidation.

76.     Upon information and belief, defendant City and its agency, the New York City Police Department, failed to effectively screen, hire, train, supervise, and discipline their police officers, including the defendant police officers herein, for lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing the defendant police officers to be in a position to elicit false testimony from witnesses and to fabricate evidence sufficient to secure convictions in violation of federal and state constitutional rights, and/or to permit these actions to take place with those officers' knowledge and/or consent.

77.     Upon information and belief, the defendant police employees herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to or should have given notice to defendant City and its agency, the New York City Police Department, that the defendant police officers herein were likely to engage in conduct that would violate the civil and constitutional rights of the public, specifically the conduct complained of by the plaintiff herein.

78.     As a result of the foregoing conscious policies, practices, customs and/or usages, defendant City and its agency, the New York City Police Department, permitted and allowed the employment and retention of individuals as police officers whose individuals circumstances place the public or segments thereof at substantial risk of being the victims of preconceived determinations of guilt.

79.     The plaintiff's injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowledge and repeated failure of the defendant City and the New York City Police Department to properly supervise, train, and discipline their police officers.

80.     Defendant City knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1 and 6 of the Constitution of the State of New York, including, without limitation, the plaintiff's freedom of deprivation of liberty without due process of the law.

81.     The defendant City is directly liable and responsible for the acts of the individual police officer defendants for state law claims under the doctrine of *respondeat superior*.

### For the Actions of the BCDAO Prosecutors & their Investigators
### Pursuant to the Policies and Practices in Existence at the Time of the McKee Case

82.     All of the acts by the defendant prosecutors and their investigators described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein were engaged in with the full knowledge, consent, and under the supervisory authority of the BCDAO.

83.     Defendant City and the District Attorney's Office, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the defendant prosecutors' and their investigators' wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

84.     The actions of the defendant prosecutors and their investigators resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by the BCDAO, to prosecute and continue to prosecute persons through fabricated and manipulated allegation without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to call witnesses in their defense by impermissible means such as intimidation, coercion, and other abuses of authority.

85.     The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the BCDAO and the City for a substantial period of time.

86.     Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officials of the BCDAO and the City and their predecessor in interest did not take steps to terminate these policies and practices, did not discipline individuals who engage in such practices, or otherwise properly train prosecutors and investigators with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs and practices through their deliberate indifferent to or reckless disregard of the effect of said policies, customs, and practices upon the constitutional rights of persons in the City of New York.

87. The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia,* the following:

   a. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators who participate with, conspire with, and advise police officers in using coercive interrogation techniques during the course of an investigation;

   b. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators who conspire with police officers during the course of an investigation to prevent potential witnesses for the defense from testifying through coercive and intimidating tactics;

   c. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

   d. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators during the course of an investigation to prevent persons being interviewed from having access to counsel;

   e. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators regarding the documenting and exchanging of exculpatory evidence during the course of an investigation to prevent persons being wrongfully accused and incarcerated; and

   f. The failure to ensure that information given to on-duty assistant district attorneys by police officer and detectives is properly recorded, documented and shared with other assistant district attorneys and defense counsel.

88. The aforementioned City policies, practices, and customs of failing to supervise, train, instruct, and discipline prosecutors and investigators and encouraging their misconduct are evidence by the broad-sweeping prosecutorial misconduct detailed herein. Members of the BCDAO directly subjected Mr. McKee to wrongful arrest, prosecution and conviction. These prosecutors and investigators represent the corrupt investigative policies and practices of the BCDAO.

89.     The City of New York's policies, practices and customs in existence at the time -

of failing to supervise, train, instruct, and discipline police officers and encouraging their

misconduct are further evidenced, *inter alia,* by the Mollen Commission's conclusion that the

same tolerance for perjury and falsifications that is exhibited among police officers is exhibited

among BCDAO prosecutors and investigators.

90.     The Commission specifically noted that "several former and current prosecutors

acknowledged-- 'off the record' – that perjury and falsifications are serious problems in law

enforcement that, though not condoned, are ignored." Mollen Commission, Report, p. 42.

## DAMAGES

91.     The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-

faith acts and omissions of the City and the NYPD and BCDAO Defendants caused Mr. McKee

to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced Mr.

McKee to serve over twenty years in jail and prison for a brutal crime he did not commit.

92.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless,

and/or deliberately indifferent acts and omissions, Mr. McKee sustained injuries and damages,

which continue to date and will continue into the future, including: loss of freedom for nearly

twenty-one years; pain and suffering; severe mental anguish; emotional distress; loss of family

relationships; severe psychological damage; loss of property; loss of income;  humiliation,

indignities and embarrassment; degradation; permanent loss of natural psychological

development; and restrictions on all forms of personal freedom including but not limited to diet,

sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity,

personal fulfillment, sexual activity, family relations, reading, television, movies, travel,

enjoyment, and expression, for which he is entitled to monetary relief.

93.     Specifically, and as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. McKee sustained physical injuries and damages, including: physical pain and suffering; personal injuries; infliction of physical illness; and inadequate medical care, for which he is entitled to monetary relief.

94.     When Mr. McKee was falsely arrested for this crime, he had a good ongoing relationship with family and friends, all of which relationships were cut off, aside from occasional prison visits, for the remainder of his imprisonment.

95.     Defendants' unlawful actions also caused Mr. McKee to suffer significant mental anguish; social stigma; restrictions on liberty; loss of property; interference with familial relationships; and financial burdens.

96.     All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## **FEDERAL CLAIMS**

### **COUNT I**
### **42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution**
*Against Gaughan, Tierney and Racolin ,*
*Does # 1-10, and Roes # 1-10*

97.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

98.      Defendants Gaughan, Tierney and Racolin, Does # 1-10, and Roes # 1-10, with malice and knowing that probable cause did not exist to arrest Plaintiff and prosecute him for murdering Theodore Vance, acting individually and in concert, causing Plaintiff to be arrested, charged, and prosecuted for that crime, thereby violating Plaintiff's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.  Specifically:

    a.  Defendants Gaughan and Tierney and Does # 1-10, acting individually and in concert, intentionally withheld exculpatory evidence from other prosecutors and defense counsel and misrepresented to prosecutors, Plaintiff and his trial counsel, the grand jury, and the trial court exculpatory facts that vitiated probable cause against Plaintiff and would have impeached witnesses for the prosecution at trial, including, but not limited to, the fact that the identification of Plaintiff as the murderer of Mr. Vance was contrary to all other evidence in the case and that there was evidence tending to prove that Plaintiff was innocent and that the murder was committed by others. These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to others  and away from Plaintiff;

    b.  Defendant Racolin and Roes # 1-10, acting individually and in concert, substantially withheld and interfered with exculpatory evidence that vitiated probable cause against Plaintiff and that would have impeached evidence introduced at trial, including, but not limited to, the fact that the identification of Plaintiff as the murderer of Mr. Vance was contrary to all other evidence in the case and that there was evidence tending to prove that Plaintiff was innocent and that the murder was committed by others; and

    c.  These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to others and away from Plaintiff.

99.      The aforementioned Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No police officer or member of a district attorney's office would have believed this conduct was lawful.

100.      Plaintiff is completely innocent of murdering Theodore Vance.

101.    The prosecution finally terminated in Plaintiff's favor in January 29, 2018 when the indictment was dismissed.

102.    As a direct and proximate result of these Defendant's actions, Mr. McKee was for more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II
**42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and Denial of Fair Trial by Fabricating Evidence and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Gaughan, Tierney Racolin and*
*Does # 1-10, and Roes # 1-10*

103.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

104.    Defendants Gaughan, Tierney, Racolin and  Does # 1-10, and Roes # 1-10, acting individually and in concert, deprived Plaintiff of his clearly established constitutional right under the Fourteenth Amendment of the United States Constitution, to a fair trial.  Specifically:

a.   Defendants Gaughan and Tierney and Does # 1-10, acting individually and in concert, intentionally withheld exculpatory evidence from other prosecutors and defense counsel and misrepresented to prosecutors, Plaintiff and his trial counsel, the grand jury, and the trial court, including exculpatory facts that vitiated probable cause against Plaintiff and would have impeached witnesses for the prosecution at trial, including, but not limited to, the fact that the identification of Plaintiff as the murderer of Mr. Vance was contrary to all other facts and evidence in the case and that there was evidence tending to prove that Plaintiff was innocent and that the murder was committed by another.

b.   These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to others and away from Plaintiff; and

c.   Defendant Racolin and Roes # 1-10, acting individually and in concert, substantially withheld and interfered with exculpatory evidence that vitiated probable cause against Plaintiff and that would have impeached evidence introduced at trial, including, but not limited to, the fact that the identification of Plaintiff as the murderer of Mr. Vance was contrary to all other evidence in the case and that there was evidence tending to prove that Plaintiff was innocent and that the murder was committed by another.

    d.  These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to others and away from Plaintiff.

105.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional right to be free from deprivation of liberty without due process of law.

106.    Plaintiff is completely innocent of murdering Theodore Vance.

107.    The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

108.    As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT III
**42 U.S.C. § 1983 Failure to Intercede**
*Against Gaughan, Tierney Racolin and,*
*Does # 1-10, and Roes # 1-10*

109.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

110.    By their conduct and under color of state law, Defendants Gaughan, Tierney, Racolin, Does # 1-10, and Roes # 1-10, had opportunities to intercede on behalf of Plaintiff to prevent his false arrest, malicious prosecution, false imprisonment, deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

111.     These Defendants' failures to intercede violated Plaintiff's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.

112.     No reasonable police officer or ADA in or after 1992 would have believed that failing to intercede to prevent these Defendants from withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Plaintiff to be arrested and prosecuted without probable cause, was lawful.

113.     Plaintiff is completely innocent of murdering Theodore Vance.

114.     The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

115.     As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IV
### 42 U.S.C. § 1983 Civil Rights Conspiracy
*Against  Gaughan, Tierney, Racolin and
Does # 1-10, and Roes # 1-10*

116.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

117.     Detectives Gaughan, Tierney, and Does # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including ADA Racolin and Roes #1-10, conspired to act in concert in order to deprive Plaintiff of this clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable

searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

118.    In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a. Falsely arresting and imprisoning Larry McKee, knowing that they lacked probable cause;

b. Fabricating inculpatory evidence in reports, witness statemets and pretrial communications with the prosecution, including the purportedly independent identifications of Plaintiff;

c. Committing perjury during hearings and at trial;

d. Eliciting false testimonies to implicate Plaintiff; and

e. Intentionally or with deliberate indifference, failing to comply with their duty to disclose *Brady* material during the pendency of the case.

119.    Defendants Gaughan, Tierney, Racolin Does #1-10 and Roes # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his clearly established Fourth and Fourteenth Amendment right to be free from malicious prosecution, false imprisonment, deprivation of liberty without due process, and to a fair trial.

120.    As a direct and proximate result of these defendant's actions, Mr. McKee spent 22 years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

121.    Plaintiff is completely innocent of murdering Theodore Vance.

122.    The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

123.    As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT V
### 42 U.S.C. § 1983 Supervisory Liability
*Against The City of New York and BCDAO*

124.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

125.    The individual defendants acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by their supervisors, in this case and as a matter of practice.

126.    Defendants' supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendants and, thereby causing the individual defendants to deprive Plaintiff of his clearly established constitutional rights, including his rights to be free from malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

127.    Had Defendants' supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers, these defendants would not and should not have caused Plaintiff to continue to be maliciously prosecuted without probable cause.

128.    Defendants' supervisors were directly involved in the investigation of Plaintiff and directly supervised the specific investigative acts taken by the individual defendants in this case.

129.    The grossly negligent, reckless, and/or deliberately indifferent conduct of

Defendants' supervisors under color of state law violated their clearly established duty to

supervise defendants  Gaughan, Tierney and Racolin Does #1-10 and Roes # 1-10,  and no

reasonable supervisor would have believed that grossly negligent, reckless, and/or deliberately

indifferent supervision in the face of actual or constructive notice of misconduct by their

subordinates was lawful.

130.    Plaintiff is completely innocent of murdering Theodore Vance.

131.    The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when

the indictment was dismissed.

132.    As a direct and proximate result of these defendant's actions, Plaintiff spent more

than two decades wrongly convicted and imprisoned and suffered the other grievous and

continuing damages and injuries set forth above.

**COUNT VI**
**42 U.S.C. § 1983** *Monell* **Claim**
*Monell* **Unconstitutional Policy, Custom, or Pattern and Practice of Promoting,**
**Facilitating, or Condoning Improper, Illegal and Unconstitutional Investigative Techniques**
**and Failure to Supervise, Disciple, and Train**
*Against Defendant City of New York for the*
*Actions and Omissions of the Police Officer Defendants & the NYPD*

133.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further

alleges as follows.

134.    Prior to and at the time of the unlawful investigation, prosecution, and conviction,

of Plaintiff, the NYPD, by and through its final policymakers, maintained a policy, custom, or

pattern and practice of promoting, facilitating, or condoning, improper, illegal, and

unconstitutional investigative techniques, including but not limited to the following: (a) the use

of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and

interrogations to obtain false statements and testimonies; (b) the use coercive tactics, intimidation, undue suggestion, and unlawful bribery to interfere with a criminal defendant's right to call witnesses; (c) the fabrication of inculpatory evidence; (d) the suppression of exculpatory and/or impeachment evidence; (d) the intentional failure to conduct adequate investigations of crimes; (e) proceeding in the arrest and prosecution of individuals despite evidence of their innocence; and (f) engaging in affirmative concealment and cover up of this type of misconduct.

135.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Plaintiff, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline and train NYPD detectives and officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews.

136.    The NYPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to adequately supervise, discipline, and train NYPD Department detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple New York City Police detectives and supervisors in relations to multiple witnesses in the Plaintiff's investigation, as described above.

137.    The NYPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train was also reflected by several prior cases and investigations which, upon information and belief, were known to the NYPD defendants and policymakers prior to and during the Plaintiff's investigation including those listed in the attached Exhibit "B."

138.   The misconduct committed in those cases was actually or constructively known to the NYPD supervisors and policymakers prior to and during the McKee investigation, and upon information and belief, NYPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate detectives and officers in response to such notice or make any meaningful investigation into the above practices and techniques.

139.   The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Plaintiff including:

   a.   the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

      (i)   The Constitutional duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

      (ii)  the continuing Constitutional obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

      (iii) the continuing Constitutional duty to conduct and adequate investigation and to timely disclose to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

      (iv)  the Constitutional duty to refrain from coercing or manufacturing false inherently unreliable statements and testimony from witnesses; and

   b.   The failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters and

   c.   The aforesaid policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were deliberately implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, the NYPD,  District Attorney of Bronx County and their delegates, who knew:

     (i)     to a moral certainty that such policies, procedures, customs practices and/or policies concern issues that regularly arise in the investigation and prosecution of criminal cases;

     (ii)    that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choices;

     (iii)   that the wrong choices by municipal employees concerning such issues will frequently cause the deprivation of the Constitutional rights of an accused and cause him Constitutional injury.

140.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraphs based upon, among other circumstances:

    a.   Numerous credible allegations, many substantiated by judicial decisions, some of which are listed in Exhibit "B", that Bronx ADAs had violated their Brady and disclosure obligations, had presented or failed to correct false or misleading testimony and argument, or had improperly importuned or coerced inherently unreliable statements or testimony from witnesses;

    b.   numerous decisions of the United States Supreme Court; the United States Court of Appeals for the Second Circuit; The New York Court of Appeals; The various Department of the Appellate Division of the Supreme Court of the State of New York; discussing the difficult issues that regularly arise under the Brady rule and the failure of prosecutors in New York State including in Bronx County to properly comply with that rule;

    c.   judicial decisions putting the NYPD, BXDA and BCDAO on notice that the City could be held liable for its failure to adequately train, supervise or discipline its police officers and ADAs regarding their Brady and related disclosure and due process obligations including conducting a Constitutionally adequate investigation ; see, e.g.  *Walker v. City of New York,* 972 F.2d 293 (2d Cir. 1992);  *Ramos v. City of New York,* 285 A.D.2d 284 (1st Dep't 2001); and

    d.   the inherent obviousness of the need  to train, supervise and discipline police officers and ADAs in their aforementioned Constitutional obligations to counteract the inherent pressure on police and prosecutors to obtain convictions.

141.    Such unconstitutional municipal customs, practices and/or polices were the moving force behind the withholding of evidence and false testimonies, statements and coercive tactics used against Plaintiff, causing his arrest, prosecution, and over twenty ears of incarceration, as well as the other grievous injuries and damages set forth above.

## COUNT VII

**_Monell_ Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal, and Unconstitutional Investigative Techniques and Failure to Supervise, Discipline & Train**
_Against Defendant City of New York and BCDAO for the Actions and Omissions of the BCDAO Defendants and the BCDAO_

142.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

143.    At the time of Plaintiff's arrest and prosecution, and continuing through the time the charges against Plaintiff were dismissed, the Bronx County District Attorney ("BCDA"), as the manager, chief administrator and policy-maker of the BCDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his or her employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Bronx, New York.

144.    Among other things, BCDAO engaged in a custom and practice of engaging in malicious prosecutions by: (a) knowingly presenting false testimony and arguments at criminal proceedings; (b) suppressing _Brady_ information; and (c) covering up these unlawful practices and by the methods listed in paragraphs 115 and 116 supra.

145.    These policies, customs, and practices began with Robert Johnson's induction as BCDA in 1989, continued when Darcel Clark became BCDA in 2016, and persisted through at least 2017.

146.     The BCDA, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors working with the BCDAO.  These policies, customs, and practices proximately caused the violations of Plaintiff's constitutional rights described above and his malicious prosecution, false imprisonment and other damages.

147.     The BCDA's policy was to tolerate, fail to discipline, and encourage violations of his or her Office's constitutional obligation to not maliciously prosecute defendants.

148.     The BCDA's deliberate indifference to such violations created an atmosphere that "anything goes" and prosecutions should be secured at all costs that caused such violations to continue, including in Plaintiff's case.

149.     Under the BCDAO's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required.

150.     The BCDAO's training and discipline policies and practices were likewise consciously designed to permit and encourage malicious prosecutions.

151.     Prosecutors were trained not to disclose *Brady* and other information favorable to a defendant by misrepresentation or rationalizing non-disclosure by subjectively assessing the information as unreliable and encouraged to cover up *Brady* information kept hidden by other members of the BCDAO.

152.     Through a policy, custom, and practice of not disciplining prosecutors for *Brady* and other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the BCDAO encouraged such violations by demonstrating to prosecutors that there

would be no negative consequences for the failure to comply with *Brady* and other constitutional requirements.

153. Upon information and belief, despite numerous court decisions finding that prosecutors had maliciously prosecuted defendants by failing to disclose *Brady* and other information favorable to a defendant or otherwise had engaged in conduct that misled courts, juries, defendants, and/or defense attorneys, none of the BCDAO prosecutors or investigators involved was disciplined.

154. Upon information and belief, under the BCDAO's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

155. Upon information and belief, even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.

156. Upon information and belief, no prosecutor was reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

157. To the contrary, in opposing Plaintiff's and other criminal defendants' efforts to obtain *Brady* and other information favorable to the Plaintiff and other defendants, or relief for a prosecutor's improper failure to provide such disclosure, the BCDAO stubbornly defended the propriety of their employees' behavior, thereby ratifying and signaling their tolerance of it. Upon information and belief, personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions.

158. The violations of Plaintiff's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct chargeable to defendant City of New York

amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the BCDAO, including:

    a.  The institution and implementation of inadequate and unlawful policies, procedures and customs concerning:

        i.  the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including grand jury proceedings, pretrial hearings, and trials;

        ii.  the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred; and

        iii.  the continuing duty to obtain, preserve, and timely disclose, during criminal prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses and the prosecution's theory of the case; and

    b.  the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

159.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policy making officials for the defendant City of New York, including, but not limited to the BCDAO which knew to a moral certainty that such policies, procedures, regulations, practices and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases; that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for the further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make wrong choice; and that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause constitutional injury.

160.     The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances: as noted above, numerous credible allegations, many substantiated by judicial decisions, including those listed in Exhibit "B", that prosecutors and investigators wrongfully withheld evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady* or state discovery laws and/or had presented or failed to correct false or misleading testimony and argument; numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of the New York City or BCDAO prosecutors with that rule; judicial decisions putting the BCDAO on notice that the City could be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process; the need to train, supervise and discipline prosecutors in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

161.     Despite this knowledge, the supervisory and policymaking officers and officials of the defendant City, including the BCDAO, perpetuated or failed to take preventative or remedial measures to terminate said policies, procedures, regulations, practices and/or customs; did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in violations of *Brady* and related constitutional obligations; and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated

the policies, procedures, regulations, practice and/or customs, described above, with deliberate indifference to the effect this would have upon the constitutional rights of individuals and citizens of the City and State of New York.

162.     The BCDAO further exhibited an indifference towards this type of misconduct by its hiring and retention of Daniel McCarthy in 1992 who subsequently became the head of trial training for the office in 1994.

163.     In 1990, just two years before McCarthy's hiring, a Queens County Supreme Court judge found that McCarthy had engaged in a scheme to withhold *Brady* material from a defense attorney, in the case of *People v. Steadman and Blair*, Ind. # 3331/1988.

164.     The Court of Appeals in *People v. Steadman*, 82 NY2d 1, 7 (1993) found that McCarthy had "personally" engaged in a "studied effort" to conceal *Brady* material.

165.     Despite these decisions, McCarthy was named head of training in the Bronx.

166.     The Bronx District Attorney was further put on notice of the Office's problem with the types of prosecutorial misconduct that occurred in Plaintiff's prosecution in the civil rights lawsuit *Ramos* v. *City of New York*, Index No. 21770-93 (Bronx County), which was filed on April 1, 1996, and resulted in the City of New York paying a record settlement of $5 million on or about December 15, 2003.

167.     This settlement was widely reported. *See* Andrea Elliott, *City Gives $5 Million to Man Wrongly Imprisoned in Child's Rape*, N.Y. TIMES, Dec. 16, 2003, at 14.

168.     The Plaintiff in *Ramos,* like Plaintiff here, had been falsely convicted by the Bronx District Attorney's Office as a result of *Brady* violations; the reliance by prosecutors on false and misleading evidence; and the use by the prosecutor of a false or misleading summation.

169.     This conduct was set forth in the *Ramos* complaint and substantiated through discovery in that case.

170.     *Ramos* relied on 72 (seventy-two) prior cases of similar prosecutorial misconduct, beginning in 1975 and continuing through 1996.

171.     Discovery in the *Ramos* case, before it settled, revealed that the Bronx District Attorney had never disciplined any prosecutor for misconduct, despite a long and lamentable history of such misconduct before he was elected and during his own tenure.

172.     Following its reporting of the *Ramos* settlement, The New York Times conducted its own investigation into the disciplinary practices of the Bronx District Attorney's Office.  The Times reported that Office had failed to discipline prosecutors for the types of errors that had occurred in the *Ramos* case, and, as a result, it was criminal defendants who " pa[id] the price." *See* Andrea Elliott & Benjamin Weiser, *When Prosecutors Err*, *Others Pay the Price,* N.Y. TIMES, Mar. 2, 2004, at 25. The Times articles are annexed as Exhibit "C" and incorporated herein by reference.

173.     Since the *Ramos* complaint was filed in 1996, courts have continued to find misconduct by Bronx prosecutors similar to that which was committed in the *Ramos* prosecution. and in Plaintiffs, case. *See* Exhibit "B".

174.     Upon information and belief, none of those cases has resulted in any discipline of the ADA responsible for the reported misconduct.

175.     Prior to, and following, the *Ramos* settlement, the Bronx District had no employee handbook, manual, or other document setting forth any disciplinary process for the aforementioned types of prosecutorial misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.

176.    The knowledge that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants, even after all the publicity surrounding the *Ramos* settlement, encouraged prosecutors, including Plaintiffs prosecutor, to believe that such

violations would go unpunished.  *See generally,* Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors will be Disciplined by their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong,* 80 FORDHAM L. REV. 537 (2011).

177.    The BCDAO's deliberate indifference to violations by subordinates of the Office's Constitutional obligations foreseeably encouraged such violations to occur and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

178.    The aforesaid policies, practices and customs of defendant City of New York were collectively and individually a substantial factor in bring about the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States, and in causing his malicious prosecution and resulting damages.

179.    Under the principles of municipal liability for federal civil rights violations, the BCDAO has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in the office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations to make timely disclosure of exculpatory or favorable evidence or *Brady* materials to the defense and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during grand jury proceeding, pretrial hearings, and at trial.

180.     The BCDA, personally and/or through his or her authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel, hiring, training, supervision and discipline, with respect to his Office's performance and its duties.

181.     The BCDA at all relevant times was and is an elected officer of Bronx County, one of the constituent counties of defendant City of New York, and the Office was and is funded out of the City's budget.

182.     Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law § 2, and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Bronx County), and hence defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his employees and agents.

183.     At all relevant times, the BCDA, personally and/or through his or her authorized delegates, had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

184.     By virtue of the foregoing, defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resulting injuries.

## STATE LAW CLAIMS

### COUNT VIII
### False Arrest & Malicious Prosecution
*Against All Defendants*

185.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

186.     Defendants despite knowing that probable cause did not exist to arrest and prosecute Plaintiff for murdering Theodore Vance, intentionally, recklessly, and with malice caused Plaintiff to be prosecuted and convicted for this crime.

187.     Furthermore, these Defendants intentionally concealed and misrepresented to prosecutors, grand jurors, the trial court, and courts of post-conviction hearings facts that further vitiated probable cause against Plaintiff.

188.     A notice of claim was duly filed against the City of New York on or about February 5, 2018, in compliance with General Municipal Law 50-(e) and (i).

189.     Plaintiff was deposed in accordance with General Municipal Law section 50(h) on or about July 30, 2018.

190.     More than thirty (30) days have passed since such testimony and the claim has not been adjusted or settled.

191.     Plaintiff has satisfied all conditions precedent to filing this lawsuit under law.

192.     Plaintiff is completely innocent of murdering Theodore Vance.

193.     The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

194.     As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT IX
**Negligence**
*Against All Defendants*

195.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

196.    Defendants are liable for negligence, having breached their duty of reasonable case to Plaintiff.

197.    Specifically, and by way of example, these Defendants:

    a.    Failed to accurately report how Plaintiff became a suspect in the crime and/or how defendant detectives obtained his name in connection with the crime;

    b.    Failed to accurately report the circumstances surrounding Rossy Chatlain's false implication of Plaintiff as the person who murdered Theodore Vance;

    c.    Failed to disclose exculpatory evidence, facts and testimony that tended to prove that the plaintiff was not the murderer; and

    d.    The Defendants also negligently failed to have or adhere to adequate policies regarding appropriate investigation of the Vance murder.

198.    These Defendants' negligence and gross negligence directly and proximately caused Plaintiff to be wrongfully arrested, prosecuted and imprisoned for over twenty years and/or extended the length of time he was wrongfully imprisoned.

199.    These Defendants engaged in these acts within the scope of their employment.

200.    Plaintiff is completely innocent of murdering Theodore Vance.

201.    The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

202.    As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT X
### *Respondeat Superior* Claim
*Against Defendant City of New York*

203.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

204.     At all times relevant to this Complaint, Defendants Gaughan, Tierney, Racolin Does #1-10, and Roes #1-10 acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with the City of New York.

205.     The conduct by which the Police and District Attorney Defendants committed the torts of false arrest, malicious prosecution and negligence was not undertaken for the individual Defendant's personal motives, but rather was undertaken while the Defendants were on duty, carrying out their routine investigative functions as detectives, investigators, police officers and Assistant District Attorneys.

206.     Under the doctrine of *respondeat superior,* the City of New York is liable for their agents' state law torts of false arrest, malicious prosecution and negligence.

207.     Plaintiff is completely innocent of murdering Theodore Vance.

208.     The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

209.     As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT XI
## New York State Constitution
*Against Gaughan, Tierney Racolin and,*
*Does # 1-10, and Roes # 1-10*

210.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

211.    The conduct of Defendants Gaughan, Tierney, Racolin, Does #1-10, and Roes #1-10 , described above, also violated Plaintiff's rights under the New York State Constitution, Article I §§ 6 to due process of law.

212.    Plaintiff is completely innocent of murdering Theodore Vance.

213.    The prosecution finally terminated in Plaintiff's favor on January 29, 2018 when the indictment was dismissed.

214.    As a direct and proximate result of these defendant's actions, Plaintiff spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.


## A JURY TRIAL IS DEMANDED ON ALL THE FOREGOING COUNTS


**WHEREFORE**, Plaintiff LARRY MCKEE prays as follows:

(a)    That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial but no less than $50 Million;

(b)    That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

(c)    For a trial by jury;

(d)    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)    For any and all other relief to which he may be entitled or other relief that this Court deems just and proper.  .

Respectfully Submitted,

Dated: Albertson, New York          Dated: Mineola, New York
        November 25, 2018                  November 25, 2018

*s/ Michael E. Talassazan*          *s/Oscar Michelen*

_____          _____

LAW OFFICES OF          CUOMO LLC
MICHAEL E. TALASSAZAN          By: Oscar Michelen (OM5199)
By: Michael E. Talassazan (4895660)          200 Old Country Rd.
118 Grant Avenue          Mineola New York 11501
Albertson, New York 11507          516-741-3222
917-768-1155          omichelen@cuomollc.com
michaeltalassazan@gmail.com